CML V, LLC, individually and Derivatively on behalf of JetDirect Aviation Holdings, LLC, Plaintiff Below Appellant,

v.

John BAX, Gregory S. Campbell, Louis Cappelli, Jane Garvey, Steven M. Hankin, Paul M. Harrington, Donald Hebb, Jeffrey P. Kelly, James W. Marley, Robert P. Pinkas, Peter Sinatra, Stephanie Zimmerman, and JetDirect Aviation Holdings LLC, Defendants Below Appellees,

and

JetDirect Aviation Holdings, LLC, Nominal Defendant Below Appellee.

No. 735, 2010.

Supreme Court of Delaware.

Submitted: June 22, 2011.

Decided: Sept. 2, 2011.

Corrected: Sept. 6, 2011.

David A. Jenkins, Michele C. Gott of Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware. Of Counsel: Michael J. Friedman and Gene C. Schaerr (argued), of Winston & Strawn LLP, New York, NY, for appellant.

A. Gilchrist Sparks III, (argued), and Ryan D. Stottmann of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware for appellees Gregory S. Campbell, Louis Cappelli, Jane Garvey, Paul M. Harrington, Donald Hebb, Jeffrey P. Kelly, James W. Marley, Peter Sinatra and Stephanie Zimmerman. Of Counsel: Jennifer Barrett and Hilary Ormond of Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, for appellee Jeffrey P. Kelly.

Kevin S. Mann of Cross & Simon, LLC, Wilmington, Delaware. Of Counsel: Dan C. Kozusko of Wilkie Farr & Gallagher LLP, New York, NY, for appellees John Bax and Steven M. Hankin.

Alisa E. Moen of Blank Rome LLP, Wilmington, Delaware for Robert P. Pinkas.

Before STEELE, Chief Justice, HOLLAND, BERGER, RIDGELY, Justices and BRADLEY, Judge * constituting the Court en banc.

STEELE, Chief Justice:

CML V, LLC (CML), a junior secured creditor of JetDirect Aviation Holdings, LLC, sued JetDirect's present and former officers directly and derivatively for breaching their fiduciary duties. The Vice Chancellor dismissed all four of CML's claims. Because CML, as a JetDirect creditor, lacked standing to sue derivatively on JetDirect's behalf, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

JetDirect Aviation Holdings LLC, a Delaware limited liability company, was a private jet management and charter company. As part of a roll up strategy, starting in 2005, JetDirect acquired a number of small to mid-sized competitor charter and service companies. This aggressive expansion left JetDirect with a highly leveraged balance sheet and volatile cash flows.

In 2006, JetDirect's board of managers learned about serious deficiencies in its accounting system. JetDirect's auditor informed the officers of various weaknesses and deficiencies in JetDirect's internal controls. A year later, JetDirect's new auditor—Ernst & Young LLP—declined to complete its audit because JetDirect's internal controls lacked sufficient integrity and the auditor could not rely on JetDirect's internal accounting books and records.

In 2007, JetDirect's board undertook to consolidate its billing, accounting, and other operations. The consolidation exacerbated JetDirect's preexisting internal control deficiencies. Specifically, the consolidation complicated JetDirect's billing and customer service functions, leading to increased accounts receivable and a lag in the ability of JetDirect managers to compile current operating and financial results. Nevertheless, despite lacking current information about JetDirect's true financial condition, the board approved four major acquisitions in late 2007.

In April 2007, before the board made the four late 2007 acquisitions on the basis of outdated information, CML loaned JetDirect $25,743,912 and became a junior secured lender. Later, the parties increased this loan to $34,243,912. In June 2007, JetDirect defaulted on its loan obligations to CML. By January 2008, JetDirect was insolvent. In late 2008, JetDirect's managers began liquidating JetDirect's assets to reduce its debt burden.

CML alleges that if JetDirect's managers had possessed accurate financial information, which they did not, they would have understood that JetDirect lacked the working capital to finance the late 2007 acquisitions and they would have never approved those acquisitions. CML also alleges that senior management hid adverse information from the board and that when JetDirect managers began liquidating JetDirect's assets to reduce its debt burden, certain managers negotiated sales of assets to entities that they controlled and the board approved these interested sales without adequately reviewing their propriety.

* Sitting by designation pursuant to Del. Const. art. IV § 12.

CML asserts that despite the liquidation, JetDirect has not repaid any of its debt to CML, and that after accounting for interest, the balance of CML's outstanding loan to JetDirect exceeds $40,000,000. On March 26, 2010, CML filed a Complaint in the Delaware Court of Chancery asserting both derivative and direct claims against JetDirect's present and former managers. Specifically, CML asserted derivatively that: (1) the individual defendants breached their duty of care by approving the late 2007 acquisitions without informing themselves of JetDirect's true financial condition, (2) the individual defendants acted in bad faith by consciously failing to implement and monitor an adequate system of internal controls and—with respect to one specific individual defendant—hiding critical information from the board, and (3) certain individual defendants breached their duty of loyalty by benefitting from self interested asset sales upon JetDirect's asset liquidation in 2008. CML also asserted a direct claim for money damages against JetDirect for breaching the loan agreement between the parties. Both parties and the Vice Chancellor agreed that the Court of Chancery would only have jurisdiction over the direct claim if any of the derivative claims survive a motion to dismiss; if all of the derivative claims are subject to dismissal, the direct claim would fail as well.

On May 27, 2010, JetDirect and the individual defendants moved to dismiss all four claims. The Vice Chancellor dismissed all four claims on the basis that CML, as a creditor, lacks standing to pursue derivative claims on behalf of JetDi-

rect. CML now appeals this judgment, and we affirm.

## II. STANDARD OF REVIEW

 We review judgments granting motions to dismiss under Court of Chancery rule 12(b)(6) *de novo* "to determine whether the trial judge erred as a matter of law in formulating or applying legal precepts."[1] We do not affirm a trial judge's dismissal of a claim unless the judge (i) accepts as true all well-pleaded factual allegations, (ii) accepts even vague factual allegations as "well-pleaded" if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) dismisses the Complaint only if the plaintiff would not be entitled to recover under "any reasonably conceivable set of circumstances susceptible of proof."[2] We review issues of statutory construction and interpretation *de novo*.[3] We also review issues of constitutional dimension *de novo*.[4]

## III. ANALYSIS

The parties dispute the effect of the derivative standing provisions of the Limited Liability Company Act—specifically 6 *Del. C.* §§ 18–1001 and 18–1002. CML contends that those provisions do not deprive creditors of standing to bring derivative actions on behalf of insolvent LLCs. The defendants argue that the provisions clearly deprive creditors of derivative standing. CML then contends that if, in fact, the provisions deprive the Court of Chancery of its equity jurisdiction to extend derivative standing to creditors of

1. *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (quoting *Gantler v. Stephens*, 965 A.2d 695, 703–04 (Del.2009)).

2. *In re Gen. Motors S'holder Litig.*, 897 A.2d 162, 168 (Del.2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del.2002)).

3. *Bay Surgical Servs. v. Swier*, 900 A.2d 646, 652 (Del.2006).

4. *See Stigars v. State*, 674 A.2d 477, 479 (Del. 1996).

insolvent LLCs, then those provisions are an unconstitutional limitation on the Court of Chancery's powers "in equity."

CML is wrong with respect to both claims. The LLC Act, by its plain language, exclusively limits derivative standing to "member[s]" or "assignee[s]," and that exclusive limitation is constitutional.

## I. The LLC Act Denies Derivative Standing To Creditors of Insolvent LLCs.

■■■■ The plain language of 6 Del. C. § 18–1002 is unambiguous and limits derivative standing in LLCs *exclusively* to "member[s]" or "assignee[s]." The rules of statutory construction are well settled.[5] First, we must determine whether the statute is ambiguous.[6] If it is unambiguous, then there is no room for judicial interpretation and "the plain meaning of the statutory language controls."[7] The statute is ambiguous if it is susceptible of two reasonable interpretations[8] or if a literal reading of its terms "would lead to an unreasonable or absurd result not contemplated by the legislature."[9] If the statute is ambiguous, then we consider it as a whole and we read each section in light of all the others to produce a harmonious whole.[10] We also ascribe a purpose to the General Assembly's use of particular statutory language and construe it against surplusage if reasonably possible.[11]

In this case, the parties dispute the effect of the derivative standing provisions of the LLC Act. The central provision at issue is 6 Del. C. § 18–1002, entitled "Proper plaintiff." That provision reads:

> In a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action and:
> (1) At the time of the transaction of which the plaintiff complains; or
> (2) The plaintiff's status as a member or an assignee of a limited liability company interest had devolved upon the plaintiff by operation of law or pursuant to the terms of a limited liability company agreement from a person who was a member or an assignee of a limited liability company interest at the time of the transaction.[12]

This provision is unambiguous on its face; therefore, its plain language controls. In as many words, the provision dictates that a proper derivative action plaintiff "*must* be a member or an assignee of a limited liability company interest...."[13] The statutory language is clear, unequivocal, and exclusive, and operates to deny derivative standing to creditors who are not members or assignees of membership interests.

CML contends that section 18–1002 is limited to the context of section 18–1001, entitled "Right to bring action," which reads:

5. *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 538 (Del.2011) (citing *Dewey Beach Enters., Inc. v. Bd. of Adjustment*, 1 A.3d 305, 307 (Del.2010)).

6. *Id.*

7. *LeVan*, 940 A.2d at 933 (quoting *Eliason v. Englehart*, 733 A.2d 944, 946 (Del.1999)).

8. *Id.*

9. *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 933 (Del.2007) (quoting *Newtowne Vill. Serv.*

*Corp. v. Newtowne Rd. Dev. Co.*, 772 A.2d 172, 175 (Del.2001)).

10. *Taylor*, 14 A.3d at 538 (citing *Dewey Beach Enters.*, 1 A.3d at 307).

11. *Id.*

12. 6 Del. C. § 18–1002.

13. *Id.*

A member or an assignee of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if the managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed.[14]

In other words, one part of CML's contentions posits that section 18–1001 guarantees derivative standing to members or assignees, but does not limit standing to those groups. Reading the two sections together and consistently with each other, CML contends, demonstrates that the General Assembly intended merely to rephrase the language of section 327 of the Delaware General Corporate Law,[15] which this Court has determined does not bar creditors of insolvent corporations from derivative standing.[16] According to CML, the combination of sections 18–1001 and 18–1002 shows that the General Assembly merely intended to take the corporate rule of derivative standing for creditors of insolvent corporations and apply it in the LLC context. We disagree. When statutory text is unambiguous, we must apply the plain language without any extraneous contemplation of, or intellectually stimulating musings about, the General Assembly's intent.

The text of section 18–1002 is unambiguous because it is not susceptible of two reasonable interpretations and because invoking its clear language does not yield an unreasonable or absurd result the General Assembly never contemplated.[17] First, the General Assembly used the indefinite phrase "a derivative action" instead of the definite phrase "the derivative action" to describe those derivative actions to which section 18–1002 applies. We ascribe purpose to this choice. By making the choice, the General Assembly created an independent restriction on *all* derivative actions on behalf of LLCs—not merely those derivative actions that section 18–1001 seemingly authorizes. Moreover, in section 18–1002, the General Assembly used the mandatory and exclusive "must," rather than the permissive "may" that it used in section 18–1001. That is, in the LLC context, the "Proper Plaintiff" "*must* be a member or an assignee of a limited liability company interest...." That is the only reasonable interpretation of the plain language of section 18–1002.

Finally, applying the plain language of section 18–1002 does not yield an unreasonable or absurd result the General Assembly never contemplated.[18] Indeed, sections 18–1001 and 18–1002 serve very different purposes. In section 18–1001, the General Assembly created the right to file a derivative action on behalf of an LLC and conferred derivative standing on LLC

---

14. 6 *Del. C.* § 18–1001.

15. 8 *Del. C.* § 327. Stockholder's derivative action; allegation of stock ownership

In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.

16. See *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del.2007) ("[T]he creditors of an *insolvent* corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties.") (emphasis in original).

17. See *LeVan*, 940 A.2d at 933.

18. See *Reddy v. PMA Ins. Co.*, 20 A.3d 1281, 1287–89 (Del.2011) (discussing the absurd result principle of statutory construction).

members and assignees. In section 18–1002, the General Assembly limited the scope of LLC derivative standing to members and assignees.

CML contends that this result is absurd because, given the policy underlying derivative standing, there should be no difference between LLCs and corporations. CML argues that unless the Court of Chancery can vest creditors of insolvent LLCs with derivative standing in equity, there will exist no stakeholders with incentive to enforce fiduciary duties through legal action. CML may be correct that in insolvency creditors become the ultimate risk bearers in LLCs. But, the General Assembly is free to elect a statutory limitation on derivative standing for LLCs that is different than that for corporations, and thereby preclude creditors from attaining standing. The General Assembly is well suited to make that policy choice and we must honor that choice. In this respect, it is hardly absurd for the General Assembly to design a system promoting maximum business entity diversity. Ultimately, LLCs and corporations are different; investors can choose to invest in an LLC, which offers one bundle of rights, or in a corporation, which offers an entirely separate bundle of rights.

Moreover, in the LLC context specifically, the General Assembly has espoused its clear intent to allow interested parties to define the contours of their relationships with each other to the maximum extent possible.[19] It is, therefore, logical for the General Assembly to limit LLC derivative standing and exclude creditors because the structure of LLCs affords creditors significant contractual flexibility to protect their unique, distinct interests.[20]

Because section 18–1002 is unambiguous, is susceptible of only one reasonable interpretation, and does not yield an absurd or unreasonable result, we apply its plain language. Only LLC members or assignees of LLC interests have derivative standing to sue on behalf of an LLC—creditors do not. Therefore, section 18–1002 precludes CML from suing derivatively, and the Vice Chancellor properly granted the motion to dismiss.

## II. Section 18–1002 Of The LLC Act Is Constitutional.

CML also claims that if section 18–1002 of the LLC Act limits derivative standing exclusively to "member[s]" or "assignee[s]," then it is unconstitutional. Having held that section 18–1002 in fact does limit derivative standing to "member[s]" or "assignee[s]" to the exclusion of creditors, we now confront CML's constitutional contention.

Specifically, CML argues that if section 18–1002 exclusively limits derivative standing—as we now hold that it does—then it strips the Court of Chancery of equitable

---

**19.** *See* 6 *Del. C.* § 18–1101(a), (b). Construction and application of chapter and limited liability company agreement.
 (a) The rule that statutes in derogation of the common law are to be strictly construed shall have no application to this chapter.
 (b) It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements.

**20.** Admittedly, this approach is not the only option the General Assembly had, and we make no normative comment on the General Assembly's policy choice. Our only purpose here is to explain that limiting derivative standing to members and assignees in a contractual entity like an LLC is not absurd because other interest holders—like creditors—have other options—as, for example, negotiating automatic assignment of membership interests upon insolvency clauses into the credit agreement and requiring the members and governing board to amend the LLC agreement accordingly.

jurisdiction to extend standing to sue derivatively in cases where derivative standing is necessary to prevent a complete failure of justice. This, according to CML, is an unconstitutional curtailment of the Court of Chancery's jurisdiction to less than what that jurisdiction was in 1792 when Delaware ratified its first constitution.[21] We disagree.

 The Delaware Constitution prohibits the General Assembly from limiting the equity jurisdiction of the Court of Chancery to less than the general equity jurisdiction of the High Court of Chancery of Great Britain existing at the time of our separation from the Mother Country.[22] At common law, courts of equity granted equitable derivative standing to corporate stockholders to sue on behalf of a corporation in order to prevent failures of justice.[23] This Court has recognized that a corporate derivative action is a "judicially-created doctrine" and a "creature of equity" that serves as a "vehicle to enforce a corporate right."[24] The corporate form and corporate derivative standing both pre-dated the Delaware General Corporate Law statutes. For that reason, section 327 of the DGCL [25]—the only section of our corporate statute that implicates derivative actions—does not create derivative standing. Rather, it merely limits derivative standing to those stockholders who owned their stock at the time of the allegedly wrongful transaction or whose stock devolved upon them by operation of law from a person who owned the stock at that time.[26]

 As this court has explained, "[j]udicially-created equitable doctrines may be extended so long as the extension is consistent with the principles of equity." [27] To that end, courts may extend, in equity, the judicially created equitable doctrine of corporate derivative standing "to address new circumstances." [28] Indeed, in appropriate circumstances, we have done exactly that.[29]

21. *See* Del. Const. art. IV, § 10 ("[The Court of Chancery] shall have all the jurisdiction and powers vested by the laws of this State in the Court of Chancery."); *DuPont v. DuPont*, 85 A.2d 724, 729 (Del.1951) ("[T]he general equity jurisdiction of the Court of Chancery is measured in terms of the general equity jurisdiction of the High Court of Chancery of Great Britain and is a constitutional grant not subject to legislative curtailment....").

22. *DuPont*, 85 A.2d at 729. *See also* Randy J. Holland, The Delaware State Constitution· A Reference Guide 134–35 (G. Alan Tarr ed., 2002).

23. *Schoon v. Smith*, 953 A.2d 196, 201 (Del. 2008).

24. *Id.* at 201–02 (citing 13 Fletcher Encyclopedia of the Law of Private Corporations § 5940, at 30 (2004) and R. Franklin Balotti & Jesse A. Finkelstein, 1 The Delaware Law of Corporations and Business Organizations § 13. 10, at 13–20 (3d ed.2008)).

25. 8 *Del. C.* § 327.

26. *Id.* at 204 ("Section 327 'does not create the right to sue derivatively, but rather restricts that right.' The equitable standing of a stockholder to bring a derivative action was judicially created but later restricted by a statutory requirement that a stockholder plaintiff must either have been a stockholder at the time of the transaction of which she complains or her stock must devolved upon her thereafter by operation of law." (quoting *Harff v. Kerkorian*, 324 A.2d 215, 218 (Del.Ch. 1974))). *See also* 8 *Del. C.* § 327 ("In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.").

27. *Schoon*, 953 A.2d at 205.

28. *Id.* at 204.

29. *See Gheewalla*, 930 A.2d at 101 (extending corporate derivative standing to creditors of insolvent corporations). *But see Schoon*, 953

■ Our precedent shows, however, that the common law equity power to extend derivative standing to address new circumstances is (a) exercisable only to prevent failures of justice, and (b) limited to the corporate context.[30] Absent a threat to justice in the corporate context, the High Court of Chancery of Great Britain at the time of the separation did not have equitable jurisdiction to grant or extend derivative standing.[31] Although the Delaware Constitution prohibits the General Assembly from limiting the Court of Chancery's jurisdiction over the extension of corporate derivative standing in the interests of justice,[32] this case deals not with a corporation but with a statutorily created LLC—a business entity that did not exist in 1792. Therefore, nothing in the Delaware Constitution precludes the General Assembly from limiting the scope of LLC derivative standing in 6 *Del. C.* § 18–1002 to LLC "member[s]" or "assignee[s]." [33]

Limited liability companies, unlike corporations, did not exist at common law. The corporate form existed in 1792, but LLCs came into existence in Delaware in 1992 when the General Assembly passed the Delaware Limited Liability Company Act. Indeed, the General Assembly passed the LLC Act as a broad enactment in derogation of the common law, and it acknowledged as much.[34] Consequently, when adjudicating the rights, remedies, and obligations associated with Delaware LLCs, courts must look to the LLC Act because it is only the statute that creates those rights, remedies, and obligations. CML correctly asserts that the General Assembly expressly acknowledged in the text of the LLC Act that common law equity principles supplement the Act's express provisions.[35] But what this means is that where the General Assembly has not defined a right, remedy, or obligation with respect to an LLC, courts should apply the common law. It follows that if the General Assembly *has* defined a right, remedy, or obligation with respect to an LLC, courts cannot interpret the common law to override the express provisions the General Assembly adopted. Supplementing express provisions is altogether different from displacing them or interpreting them out of existence under the guise of articulating and applying equitable principles.

Even if the Court of Chancery had the common law equitable jurisdiction to extend derivative standing outside the corporate context—which we have determined it does not—that equitable power cannot

---

A.2d at 210 (declining to extend corporate derivative standing to a corporate director).

30. *Schoon,* 953 A.2d at 201 (*"To prevent a failure of justice,* courts of equity granted equitable standing to stockholders *to sue on behalf of the corporation ...."*) (emphasis added).

31. Indeed, what we now consider alternative business entities—like LLCs—did not exist at common law.

32. *DuPont,* 85 A.2d at 729 ("[T]he general equity jurisdiction of the Court of Chancery is measured in terms of the general equity jurisdiction of the High Court of Chancery of Great Britain and is a constitutional grant not subject to legislative curtailment....").

33. *Accord Rose v. Doctors Hosp.,* 801 S.W.2d 841, 845–46 (Tex.1990) (holding that since there was no common law cause of action for wrongful death the Texas Constitution's open courts provision did not bar limiting rights and remedies that were created exclusively by statute). *See* DEL. CONST. art. I, § 9.

34. *See* 6 *Del. C.* § 18–1101(a) ("The rule that statutes in derogation of the common law are to be strictly construed shall have no application to this chapter.").

35. *See, e.g.,* 6 *Del. C.* § 18–1104 ("In any case not provided for in this chapter, the rules of law and equity, including the law merchant, shall govern.").

override the LLC Act's express provisions. In sections 18–1001 and 18–1002—unlike in DGCL section 327—the General Assembly both *created* the right to sue derivatively on behalf of an LLC and *expressly limited* that right to "member[s]" or "assignee[s]."[36] That is a valid exercise of legislative authority, and the limitation does not unconstitutionally impinge upon the constitutional jurisdiction of the Court of Chancery. In this context, there is simply no room for the common law to override the statutory mandate.

Even if the Court of Chancery did have the jurisdiction to extend LLC derivative standing—which, again, it does not—it should exercise that jurisdiction only absent an adequate remedy at law.[37] In this case, CML has ample remedy at law and there is no threat of a failure of justice that could justify the application of equity. CML contends that because JetDirect is insolvent, the creditors, as ultimate risk bearers, are the only interest holders with incentive to enforce fiduciary duties through legal action, and that without the intervention of equity a failure of justice will result. We disagree. CML could have negotiated its remedies by contract. It did not. Instead, it chose to lend on what later turned out to be unfavorable terms. As creditors, CML could have negotiated a contractual remedy at law that would not require the equitable extension of derivative standing even if the Court of Chancery had the requisite jurisdiction to do so. For example, CML could have negotiated for a provision that would convert its interests to that of an "assignee" in the event of insolvency. Or, it could have negotiated for a term that would give CML control of the LLC's governing body in such an event. These are but two examples. Of course, CML may have had to pay for broader contractual rights, by forsaking a higher interest rate or otherwise, in negotiating the loan terms and conditions, but CML made a choice. The mere fact that CML's contractual decisions in crafting its loan documents did not adequately protect its legal remedies in the event of insolvency hardly "threatens the interests of justice" to justify Delaware courts to equitably extend standing to sue derivatively to CML as a creditor.

## IV. CONCLUSION

Section 18–1002 of the LLC Act, by its plain language, limits LLC derivative standing to "member[s]" or "assignee[s]," and thereby denies derivative standing to LLC creditors. That limitation is constitutional because, as pertains to this case, the Delaware Constitution only guarantees the Court of Chancery the equity jurisdiction to extend derivative standing to prevent failures of justice in cases involving corporations. Therefore, we affirm the judgment of the Court of Chancery.

---

**36.** *See* 6 *Del. C.* §§ 18–1001; 18–1002.

**37.** *Chavin v. H.H. Rosin & Co.*, 246 A.2d 921, 922 (Del.1968) ("It is, of course, axiomatic that Equity has no jurisdiction over a controversy for which there is a complete and adequate remedy at law.").